## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| KEN JOHNSON PROPERTIES, LLC, | Civil No. 12-1582 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| HARLEYSVILLE WORCESTER INSURANCE COMPANY, | |
| Defendant. | |

Alexander M. Jadin, **ROEDER SMITH JADIN, PLLC**, 7900 Xerxes Avenue South, Suite 2020, Bloomington, MN 55437, for plaintiff.

Andrew D. Deutsch, **MEAGHER & GEER, PLLP**, 33 South Sixth Street, Suite 4400, Minneapolis, MN 55402, for defendant.

This is an insurance coverage dispute arising out of damage to an apartment building in Saint Paul, Minnesota, owned by Plaintiff Ken Johnson Properties, LLC ("Johnson Properties"). Extensive rain fell on the apartment building in May 2011. Due to a clogged roof drain the rain was not properly diverted from the roof. Consequently, water pooled and caused damage to the building's roof and interior ceilings rendering at least one apartment unit uninhabitable. Johnson Properties sought coverage for the damage under a property insurance policy issued by Harleysville Worcester Insurance Company ("Harleysville"). Harleysville provided coverage pursuant to an endorsement that caps coverage for damage resulting from water backing up through or overflowing from a drain at $25,000. Harleysville determined that the damage was not covered under

an additional insurance provision providing full coverage for building collapse due to the weight of rain that collects on a roof.

Johnson Properties filed the present action alleging that Harleysville breached the insurance policy when it limited coverage to $25,000.  The parties bring cross motions for summary judgment with respect to the breach of contract claim.  Harleysville also moves for summary judgment on Johnson Properties' claims for waiver/equitable estoppel and a declaratory judgment regarding appraisal.   Because the Policy provides coverage for damage caused by collapse due to the weight of rain pooling on a roof, even when the endorsement coverage is triggered, the Court will grant Johnson Properties' motion for summary judgment with respect to its breach of contract claim.  Additionally, because no material issue of fact remains regarding Johnson Properties' claims for waiver, estoppel, or declaratory judgment, the Court will grant Harleysville's motion with respect to these claims.

## BACKGROUND

Johnson Properties owns a multi-unit apartment building ("the Building") located at 1985 Grand Avenue, Saint Paul, Minnesota.  (Second Decl. of Andrew D. Deutsch, Ex. 1 (Dep. of Kenneth D. Johnson ("Johnson Dep.") 6:16-23), Feb. 1, 2013, Docket No. 31.)  Ken Johnson ("Johnson") is the sole owner of Johnson Properties, and manages the Building.  (Johnson Dep. 6:22-7:5, 8:7-13.)

## I.       THE HARLEYSVILLE INSURANCE POLICY

Johnson Properties obtained a Business Owners' insurance policy (the "Policy") from Harleysville effective from August 1, 2011, through August 1, 2012.  (Aff. of Alexander M. Jadin, Ex. A at 10, Dec. 26, 2012, Docket No. 19.)  The Building and the premises located at 1985 Grand Avenue, Saint Paul, Minnesota, are covered property under the Policy.  (*Id.*, Ex. A at 14-16.)

The property coverage section of the Policy provides: "We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."  (*Id.*, Ex. A at 51.) The Policy defines a covered cause of loss as "[r]isks of direct physical loss," unless the loss is specifically excluded in Paragraph B of the Policy's exclusions section, or limited in Paragraph 4 of the Policy's limitations section.  (*Id.*, Ex. A at 52.)

### A.       Coverage for Water Damage

Paragraph B of the Policy excludes coverage for certain water-related damages, stating, in relevant part, that Harleysville:

> will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.  These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.
>
> . . . .
>
> g.  Water
>
> . . . .
>
>      (3)    Water that backs up or overflows from a sewer, drain or sump[.]

(*Id.*, Ex. A at 65-66.)  A "Water Back-Up and Sump Overflow Endorsement" (the "Water Endorsement") brings certain water damage back within the scope of the Policy's coverage.  (*Id.*, Ex. A at 36.)  The Water Endorsement provides:

> A.  We will pay for direct physical loss or damage to Covered Property, covered under Section I – Property, caused by or resulting from:
>
>> 1.  Water or waterborne material which backs up through or overflows or is otherwise discharged from a sewer or drain; or
>>
>> 2.  Water or waterborne material which overflows or is otherwise discharged from a sump, sump pump or related equipment even if the overflow or discharge results from mechanical breakdown of a sump pump or its related equipment.
>
> . . . .
>
> C.  The most we will pay per location for the coverage provided under this endorsement is $25,000 unless a higher Water Back-Up and Sump Overflow Limit of Insurance is shown in the Declarations as applicable to a specified premises and then such limit applies to the premises so designated.
>
> The coverage provided by the Water Back-Up and Sump Overflow endorsement is subject to the Limits of Insurance of Section I – Property and as such will not increase the Limits of Insurance provided in this policy.

(*Id.*, Ex. A at 36.)  The Water Endorsement explicitly deletes the exclusion in Paragraph B of the Policy for "Water that backs up or overflows from a sewer, drain or sump."  (*Id.*, Ex. A at 36, 65-66.)

## B.      Coverage for Collapse

The Policy also excludes coverage for "loss or damage caused by or resulting from . . . [c]ollapse, except as provided in the Additional Coverage for Collapse."  (*Id.*, Ex. A

at 67-68.)  The Policy does, however, provide coverage "if collapse results in a Covered

Cause of Loss," and Harleysville "will pay for the loss or damage caused by that Covered

Cause of Loss."  (*Id.*, Ex. A at 68.)  The Policy's additional coverages section includes

coverage for building collapse.  (*Id.*, Ex. A at 53-54.)  Specifically, the Policy provides

that Harleysville

> will pay for direct physical loss or damage to Covered Property, caused by
> collapse of a building or any part of a building that is insured under this
> policy or that contains Covered Property insured under this policy, if the
> collapse is caused by one or more of the following:
>
> . . . .
>
> (e) Weight of rain that collects on a roof[.]

(*Id.*, Ex. A at 54-55.)  The Policy defines collapse as:

> (1) With respect to buildings:
>
> > (a)  Collapse means an abrupt falling down or caving in of a building
> > or any part of a building with the result that the building or part of
> > the building cannot be occupied for its intended purpose;
> >
> > (b)  A building or any part of a building that is in danger of falling
> > down or caving in is not considered to be in a state of collapse;
> >
> > (c)  A part of a building that is standing is not considered to be in a
> > state of collapse even if it has separated from another part of the
> > building; and
> >
> > (d)  A building that is standing or any part of a building that is standing
> > is not considered to be in a state of collapse even if it shows
> > evidence of cracking, bulging, sagging, bending, leaning, settling,
> > shrinkage or expansion.

(*Id.*, Ex. A at 54.)

### C.      Appraisal

The Policy also contains an appraisal provision under the "Property Loss Conditions" section.   Under the provision, if Harleysville and Johnson Properties "disagree on the amount of loss" either party "may make written demand for an appraisal of the loss."  (*Id.*, Ex. A at 70.)

> In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire.  If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two will be binding.

(*Id.*)   Pursuant to the appraisal provision, both parties agree to pay its own appraiser's costs, and bear the other expenses of the appraisal and umpire equally.  (*Id.*)   Finally, Harleysville retains its right to deny the claim, even if an appraisal is conducted.  (*Id.*)

## II.      MAY 2012 RAIN EVENT

On May 10 and 11, 2012, approximately 2.8 inches of rain fell on the Building. (Jadin Aff., Ex. G at 1.)  On May 11, Johnson learned that water was leaking into one of the Building's apartments.  (Johnson Dep. 16:5-12, 17:2-15.)  After observing the leak from the apartment's interior, Johnson inspected the roof above the apartment.  (*Id.* 18:18-22; Jadin Aff., Ex. G at 1.)   On the roof, Johnson discovered a large pool of standing water on the southern portion of the roof around one of the Building's two roof drains. (Johnson Dep. 19:2-20:2.)  Johnson testified that he had never had problems with the roof drain clogging prior to May 11.  (*Id.* 23:12-15.)

Johnson called his roofer, who arrived at the building and began pumping water off of the roof.  (*Id.* 20:10-21.)  Later, the Saint Paul Fire Department arrived and assisted in the efforts to remove the water.  (*Id.* 21:4-20.)  Johnson's roofer was then able to snake the roof drain, dislodging an obstruction approximately six to seven feet inside the drain. (*Id.* 21:20-24; Jadin Aff., Ex. G at 1.)  Johnson believes that the roof was clogged by "helicopter" or maple tree seeds.  (Johnson Dep. 22:17-23:11.)  The Fire Department noted in its incident report that "standing water on the roof for an undetermined amount of time caused it to leak into apartments below, then causing ceiling collapse in several apartments."  (Jadin Aff., Ex. D at 3.)  The Fire Department referred the Building's problems to the Fire Marshal citing "a concern that the roof may collapse."  (*Id.*)

## III.   INSURANCE CLAIM

On or about May 11, 2012, Johnson Properties notified Harleysville of the damage to the Building.[1]  Harleysville contacted independent adjuster Alex Uhler to investigate the loss.  Uhler took photographs of the damage to the Building on May 14, 2012. (Second Deutsch Decl., Ex. 2.)  The photographs show that internal ceilings were cracked, and at least one ceiling had a hole in it.  (*Id.*, Ex. 2 at 6.)  The photographs also reveal that the roof was sagging and roof joists had been broken.  (*Id.*, Ex. 2 at 1-2, 10.)

---

[1] It does not appear that Johnson Properties' initial notification to Harleysville is part of the record.  Neither party disputes that Johnson Properties timely notified Harleysville of the damage to the Building in accordance with the Policy.

## A.      The City's Inspection

On May 21, 2012, the City of Saint Paul Department of Safety and Inspections inspected the Building and found a number of deficiencies.  (Jadin Aff., Ex. E.)  The inspection report required Johnson to "[r]epair damaged structural support members in an approved manner in area of sagging roof section."  (*Id.*, Ex. E at 2.)  The inspection report also condemned Unit 202 as "unfit for human habitation."  (*Id.*)  With respect to Unit 202, the report indicated that "[t]his unit is condemned due to damaged and falling ceiling plaster and due to damage to roof above this unit.  This unit must be vacated by May 23, 2012 at 10:00 am and may not be re-occupied until inspected and approved."  (*Id.*)  The report also directed Johnson to repair all water damaged areas of the trim, woodwork, and walls throughout Unit 202.  (*Id.*)  The City of Saint Paul apparently condemned a second unit in the Building on May 24.  (Johnson Dep. 30:10-23.)

## B.      Harleysville's Engineer Report

Harleysville retained Encompass, Inc., an engineering consulting and forensic analysis firm, to inspect the Building.  (Jadin Aff., Ex. G.)  Encompass documented its findings in a May 24, 2012 report.  (*Id.*)  Encompass found that a 40 by 20 foot area of the roof "has sagged" and was sitting 10.5 inches lower than the adjacent roof drain.  (*Id.*, Ex. G at 2.)  The report also noted that "roof joists at the area of the roof sag were broken and splintered."  (*Id.*)  The report explained that the broken roof joists caused the roof sag, and that the joists had fractured because they were overloaded.  (*Id.*)  The report found that "[t]he load caused by the reported extent of ponding area would create [a] load

- 8 -

capable of overloading the roof." (*Id.*)  As for the roof's drains, the report found that "it is apparent that the south roof drain was not functioning" and that "a clog must have been present in the south drain pipe." (*Id.*)  Finally, the report concluded that "[w]ater entered the building through the roof after the roof structure failed.  The roof structure failed due to the inability of the south roof drain to remove the rainwater from the roof, likely as a result of the clog." (*Id.*, Ex. G at 3.)

### C.    Coverage Determination

In a May 29, 2012 letter Harleysville notified Johnson Properties that it would provide coverage for the damage to the Building pursuant to the Water Endorsement. (Jadin Aff., Ex. B.)  Harleysville stated in the letter that "it appears that a clogged drain on the roof of the building caused ponding of water on the roof.  The ponding of the water caused the roof to sag.  The sagging roof resulted in damage to the roof and water damage inside the building." (*Id.*, Ex. B at 1.)  Therefore, Harleysville agreed "to provide coverage for this loss under the endorsement for Water Back-Up and Sump Overflow." (*Id.*)  Harleysville noted that "[t]he coverage available under the Water Back-Up and Sump Overflow endorsement is limited to a maximum of $25,000," and concluded that it would pay only that limit to Johnson because "it appears that no other coverage is available under the policy for this loss." (*Id.*, Ex. B at 1, 4)

With respect to additional coverage for Collapse, Harleysville explained:

Please be advised that it appears there is no additional coverage available for Collapse.  The Exclusion for Collapse states there is no coverage for Collapse unless the additional coverage for Collapse applies.  However, the additional coverage for Collapse is only available if there is an abrupt

> falling down or caving in of the building or part of the building.  Because
> the roof is sagging and has not abruptly fallen down or caved in, there
> appears to be no Collapse and therefore no additional coverage for
> Collapse.

(*Id.*, Ex. B at 4.)

Finally, Harleysville reserved all of its rights under the Policy in the May 29, 2012

letter.  Harleysville indicated that its investigation of the loss was ongoing and that the

investigation "is being conducted subject to a complete reservation of rights.  Neither

Harleysville's investigation nor this letter or any other communication is a waiver of

Harleysville's rights under the policy or the law, whether or not mentioned in this letter.

Harleysville reserves all rights available to it."  (*Id.*)  Harleysville also indicated that "its

coverage position is based on the information available at this time.  Harleysville reserves

the right to reconsider its coverage position upon receipt of additional information."  (*Id.*)

In a June 7, 2012 letter to Johnson Properties' counsel, Harleysville confirmed its May 29

coverage determination and agreed to pay Johnson Properties $25,000 for the loss.  (*Id.*,

Ex. C.)

### D.    Johnson Properties' Engineer Report

After Harleysville limited Johnson Properties' coverage to the $25,000 payable

under the Water Endorsement, Johnson Properties hired Thatcher Engineering, Inc.

("Thatcher") to provide a structural condition assessment of the damaged portion of the

Building.  (Jadin Aff., Ex. F.)  Thatcher inspected the Building on July 10, 2012, and

issued a report on August 1, 2012.  (*Id.*, Ex. F at 1-2.)  In its report, Thatcher observed

"the complete failure and resulting collapse of primary structural roof joist beams over

the east and west spans of the southerly half of the roof . . . .  The failed roof joists in the west span have complete horizontal cracks that propagated from the bottom edge of the joists upward into the joists." (*Id.*, Ex. F at 1.)  The report indicated that these failed roof joists were offering "no structural values and are supported by adjacent roof joists through load redistribution." (*Id.*)  The report also observed "that roof joists on the east span had several collapsed joists that dropped down to the ceiling and punched holes in apartment ceilings." (*Id.*)

## IV.   JOHNSON PROPERTIES' COMPLAINT

Johnson Properties commenced this action in state court, and served Harleysville with an amended complaint in June 2012.  (Notice of Removal, Ex. B ("Am. Compl."), June 29, 2012, Docket No. 1.)  Harleysville then removed to federal court based on diversity jurisdiction.  (Notice of Removal at 2.)

In its amended complaint, Johnson Properties brings a claim for breach of contract based on the Policy.  (Am. Compl. ¶¶ 21-22.)  The amended complaint also contains a "waiver and estoppel" claim in Count II.  (*Id.* ¶¶ 23-32.)  Count II alleges that Harleysville, by paying $25,000 waived all coverage defenses under the Policy.  (*Id.* ¶ 25.)  Count II also alleges that Harleysville "misrepresented a material fact, specifically the terms of the Collapse additional coverage under the Policy," with "the intention to induce the Plaintiff to accept solely the $25,000 settlement offer as full payment for the Claim." (*Id.* ¶¶ 27, 29.)  Count II goes on to allege that "Plaintiff initially relied upon the misrepresentation of Harleysville to its detriment" and "has been damaged in an amount

in excess of $50,000 as a direct result of Harleysville's inequitable conduct herein."   (*Id.*

¶¶ 31-32.)    Finally, Johnson Properties brings a claim for declaratory judgment

demanding appraisal pursuant to the Policy and asking the Court to order the parties to

conduct such an appraisal.  (*Id.* ¶¶ 33-36.)

## ANALYSIS

### I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material

fact and the moving party can demonstrate that it is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit,

and a dispute is genuine if the evidence is such that it could lead a reasonable jury to

return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  A court considering a motion for summary judgment must view the facts in the

light most favorable to the non-moving party and give that party the benefit of all

reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 587-88 (1986).

### II.    BREACH OF CONTRACT

In a breach of contract case, a plaintiff must prove "(1) formation of a contract,

(2) performance by plaintiff of any conditions precedent to his right to demand

performance by the defendant, and (3) breach of the contract by defendant."   *Park

Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011).  Here, it is undisputed

that a contract was formed.  *See Olson v. Rugloski*, 277 N.W.2d 385, 387 (Minn. 1979)

("An insurance policy is a contract, the terms of which determine the rights and obligations of the contracting parties."). Additionally, the parties do not dispute that Johnson Properties complied with the requisite terms of the Policy by providing Harleysville with notice of its claim. Therefore, to resolve the cross motions for summary judgment, the Court need consider only whether Harleysville breached the contract by failing to comply with its coverage obligations under the Policy.

### A.     Interpretation of Insurance Policies

In determining whether coverage exists "general principles of contract interpretation apply." *Lobeck v. State Farm Mut. Auto. Ins. Co.*, 582 N.W.2d 246, 249 (Minn. 1998). The goal of insurance policy interpretation is to give effect to the parties' intent. *Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 704 (Minn. 2013). The Court must construe the terms of the policy "according to what a reasonable person in the position of the insured would have understood the words to mean." *Canadian Universal Ins. Co. v. Fire Watch, Inc.*, 258 N.W.2d 570, 572 (Minn. 1977). Unambiguous language must be given its plain and ordinary meaning. *Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co.*, 383 N.W.2d 645, 652 (Minn. 1986). A policy is ambiguous if its language "is susceptible to two or more reasonable interpretations," *Carlson v. Allstate Ins. Co.*, 749 N.W.2d 41, 45 (Minn. 2008), and ambiguous language is construed in favor of the insured, *see Bobich v. Oja*, 104 N.W.2d 19, 24 (Minn. 1960). Whether an insurance policy is ambiguous is a question of law for

the Court.  *Columbia Heights Motors, Inc. v. Allstate Ins. Co.*, 275 N.W.2d 32, 34 (Minn. 1979).

Additionally, the Court construes an insurance policy as a whole.  *Watson v. United Servs. Auto. Ass'n*, 566 N.W.2d 683, 692 (Minn. 1997).  Provisions must be "given a meaning in accordance with the obvious purpose of the . . . contract as a whole." *Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp.*, 279 N.W.2d 349, 354 (Minn. 1979) (citation omitted).  The Court will not adopt a "construction of an insurance policy which entirely neutralizes one provision . . . if the contract is susceptible of another construction which gives effect to all its provisions and is consistent with the general intent."  *Wyatt v. Wyatt*, 58 N.W.2d 873, 875 (Minn. 1953).

**B.      Burden of Proof**

Under Minnesota law the initial burden of establishing a prima facie case of coverage rests with the insured.  *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 311 (Minn. 1995), *overruled on other grounds by Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919 (Minn. 2009).  If the insured establishes coverage, the burden shifts to the insurer to prove that a policy exclusion applies.  *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006).   Policy exclusions are "construed narrowly and strictly against the insurer."  *Id.*  It is also the insured's burden to prove that an exception to an exclusion which restores coverage applies.  *SCSC Corp.*, 536 N.W.2d at 314.

The Harleysville Policy at issue is an all-risk insurance policy, therefore "coverage will exist unless a cause of loss is mentioned as an excluded cause." *Sonstegard Foods Co. v. Willington Underwriting, Inc.*, Civ. No. 05-532, 2007 WL 1501278, at *4 (D. Minn. May 21, 2007); *see also Sentinel Mgmt. Co. v. N.H. Ins. Co.*, 563 N.W.2d 296, 299 (Minn. Ct. App. 1997).  The parties appear to agree that the only potentially relevant portions of the Policy are the coverage provided for water damage under the Water Endorsement and additional coverage for collapse.  Because the burden is on the parties to establish coverage and/or an exclusion, the Court need only address the coverage and exclusion provisions of the Policy discussed by the parties.  The Court will begin by addressing the two possible sources of coverage – the Water Endorsement and the additional coverage for collapse – in isolation.  After the Court has determined whether either or both provisions could provide coverage for the loss to the Building, the Court will examine how the two provisions interact.

## C.    Coverage for Water Backing Up Through a Drain

Harleysville argues that the Water Endorsement provides coverage for damage to the Building.  Johnson Properties argues, however, that the Water Endorsement does not provide coverage because the roof drain at issue is not a "drain" within the meaning of the Water Endorsement because it was not connected to the Building's plumbing system.  Johnson Properties also appears to be arguing, in the alternative, that both the Water

Endorsement and the additional coverage for collapse provide coverage for the loss in question.[2]

As an initial matter, the Court finds that the roof drain at issue here constitutes a "drain" within the meaning of the Water Endorsement.  A drain is defined as "[a] channel or pipe along which liquid drains away . . . a pipe for leading away rainwater." *Oxford English Dictionary* 755 (6th ed. 2007); *see also Webster's Third New International Dictionary* 685 (2002) (defining drain as "an artificial channel by means of which liquid or other matter is drained or carried off").  Here, the roof opening at issue had an open end at the roof's surface connected to a chute which opened onto the ground on the side of the building one story below the roof.  This opening and chute served as a channel or pipe to divert rainwater from the roof, and therefore qualifies as a drain.  Johnson Properties has not provided, and the Court has not found, any authority supporting a definition of drain that requires the pipe or channel to connect to a plumbing system.  Instead, other courts have consistently found roof openings like the one at issue to be

---

[2] At certain points in its briefing, Johnson Properties seems to indicate that it agrees that the Water Endorsement provided coverage for damage to the Building.  (*See* Pl.'s Mem. in Support of Mot. for Summ. J. at 9, Dec. 26, 2012, Docket No. 18 (noting that Harleysville admitted coverage under the Water Endorsement); Pl.'s Reply Mem. at 2, Feb. 14, 2013, Docket No. 34 (explaining that "Ken Johnson has proven **two separate means of insurance coverage** for this loss" (emphasis added)).)  Because Johnson Properties appears to be making some argument that the Water Endorsement does not provide coverage at all, this case involves a complicated twist on the burdens of proof.  The insured bears the initial burden of establishing coverage, and the insurer bears the burden of establishing the applicability of an exclusion.  Here, the roles appear to be reversed.  Harleysville is arguing that the Water Endorsement provides coverage, while Johnson Properties appears to be arguing, at least in part, that the Water Endorsement does not provide any coverage.  Because the Court assumes, without deciding, for purposes of this order that the Water Endorsement provides coverage for the damage at issue, it need not resolve possible burden of proof issues raised by the parties' arguments.

drains within the meaning of similar insurance policy provisions.  *See, e.g.*, *Scorpio v. Underwriters at Lloyd's, London*, C.A. No. 10-325, 2012 WL 2020168, at *3 (D.R.I. June 5, 2012) (finding a roof downspout to be a drain within the meaning of a policy provision governing "water that backs up or overflows from a drain" (alterations omitted)); *Potoff v. Chubb Indem. Ins. Co.*, 874 N.Y.S.2d 124, 125 (N.Y. App. Div. 2009).  Accordingly, the Court concludes that the roof opening at issue here is a drain within the meaning of the Water Endorsement.

Although the roof opening is a drain, it is not entirely clear that the Water Endorsement provides coverage for the type of loss at issue here.  The Water Endorsement provides that Harleysville "will pay for direct physical loss or damage to Covered Property . . . caused by or resulting from . . . [w]ater or waterborne material which backs up through or overflows or is otherwise discharged from a sewer or drain."  Courts have interpreted similar provisions in two different ways.  Some courts have concluded that such provisions "include both water that comes up out of a sewer, drain, or sump ('backs up') and water that spills over from a sewer, drain, or sump ('overflows') due to a blockage."  *Cardio Diagnostic Imaging, Inc. v. Farmers Ins. Exch.*, 150 Cal. Rptr. 3d 798, 803 (Cal. Ct. App. 2012) (construing an insurance policy excluding coverage for "[w]ater that backs up or overflows from a sewer, drain or sump"); *see also Scorpio*, 2012 WL 2020168 at *3 (finding that damage from rain water which accumulated on a roof due to an obstruction in a downspout was excluded from coverage as water "that backs up or overflows from" a drain).  Other courts, however, have determined that in order for such a provision to be applicable "the water that caused

the damage must have started in a drain and then later exited that drain." *Drutz v. Scottsdale Ins. Co.*, Civ. No. 10-3499, 2012 WL 665984, at *3 (D. Md. Feb. 28, 2012) (finding an exclusion for water that "backs up or overflows from a sewer, drain, or sump" did not apply where "due to the drain's blockage . . . clean water from the supply line was unable to enter the drain and simply filled the toilet bowl until it eventually overflowed. The water that overflowed the toilet bowl and caused the subsequent damage never made it into the drain and thus could not have 'backed up or overflowed from a drain.'"); *see also Surabian Realty Co. v. NGM Ins. Co.*, 971 N.E.2d 268, 272 (Mass. 2012) (construing a backs up or overflows provision "to exclude damage caused by flood waters that spread over the surface of the ground without having entered a drain, but to cover damage caused by water that backed up after entering a drain").

The Eighth Circuit has not directly addressed the scope of a "backs up or overflows" provision, but it has considered the scope of a "surface water" exclusion in an instructive manner. In *Noran Neurological Clinic, P.A. v. Travelers Indemnity Co.*, 229 F.3d 707 (8th Cir. 2000), a clinic suffered damage after excessive rainfall in the area. A possible blockage in an atrium drain prevented diversion of the rain, and water built up in the atrium, causing one of the clinic's windows to break and water to rush into the radiology department. *Id.* at 708. The court found that this set of circumstances did not implicate a provision in the policy for "[w]ater or sewage that backs up or overflows from a sewer, drain or sump," but was instead governed by a provision excluding damage caused by "surface water." *Id.* at 709. *Noran Neurological* suggests that the Eighth Circuit would find a backup or overflow provision, such as the one at issue in the

Harleysville Policy, inapplicable to water which, due to a blockage, was never able to enter the drain.

If the Court were to interpret the Policy as providing coverage only for damage caused by water that has entered a drain and backed up or been otherwise discharged from the drain, it is certainly possible that the damage at issue may not be covered by the Water Endorsement to the extent it was caused by the weight of rainwater which was never able to enter the roof drain due to the clog.  However if the Court were to interpret the Policy as providing coverage for damage caused by water that was merely unable to enter a drain, it is certainly possible that the damage could fall under the Water Endorsement.  Ultimately, the Court need not resolve the split in authority regarding potential coverage for the Water Endorsement.  Instead, the Court will assume without deciding that Harleysville is correct that the Water Endorsement could provide coverage for the damage at issue because, for the reasons explained below, a finding of coverage under the Water Endorsement does not prevent Johnson Properties from recovering the full extent of the damage to its property under the Policy's additional coverage for collapse.

### D.     Coverage for Collapse

The parties dispute whether the Policy could potentially provide coverage for damage to the Building under the additional coverage for collapse.  Harleysville argues that because the Building is still standing additional coverage for collapse does not apply.  More specifically, Harleysville argues that although the Building's roof is sagging and

the interior ceilings are cracked and have holes in them from where roof joists have broken through, the Building has not suffered a collapse because it has not "fallen down" or "caved in." Johnson Properties argues, on the other hand, that collapsed roof joints and ceilings that have partially fallen in constitute collapse of "any part of a building" within the meaning of the Policy.

The Policy excludes coverage for damage "caused by or resulting from" collapse "except as provided in the Additional Coverage for Collapse." The additional coverage for collapse provision indicates that Harleysville "will pay for direct physical loss or damage . . . caused by collapse of a building or any part of a building . . . if the collapse is caused by . . . [w]eight of rain that collects on a roof." The Policy defines collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." The Policy also indicates that any part of a building has not collapsed if it remains standing "even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion" or if it is merely "in danger of fall down or caving in."

The Court begins by considering whether the collapse provision is ambiguous.[3] Numerous courts have interpreted similar collapse provisions and have reached differing

_____

[3] In its reply brief, Harleysville argues that Johnson Properties did not make an ambiguity argument until its own reply brief and therefore the argument should not be considered by the Court. Harleysville is correct that Johnson Properties did not argue that the collapse provision was ambiguous in its opening brief in support of its own motion for summary judgment. But Harleysville is incorrect that Johnson Properties raised the ambiguity argument only in its reply brief. This case involves cross motions for summary judgment, but the parties chose to consolidate their reply briefs with their responsive briefs, each filing only two briefs total for

(Footnote continued on next page.)

conclusions regarding whether such provisions are ambiguous. Some courts reviewing substantially similar policy language have concluded that the language is unambiguous. *See, e.g.*, *Residential Mgmt. (N.Y.) Inc. v. Fed. Ins. Co.*, 884 F. Supp. 2d 3, 9 (E.D.N.Y. 2012) (finding that a policy containing identical language "supplies a clear definition of 'collapse' to clarify any potential ambiguity"); *Mount Zion Baptist Church of Marietta v. GuideOne Elite Ins. Co.*, 808 F. Supp. 2d 1322, 1325 (N.D. Ga. 2011) (finding no ambiguity in a definition of collapse almost identical to that found in the Harleysville Policy, concluding that "[r]egardless of the many meanings attributed to the word 'collapse,' this Court must honor the specific definition of the policy when determining whether this loss is covered"). Courts finding substantially similar collapse provisions unambiguous have determined that a collapse did not occur where a building "had outwardly bowed sidewalls and a sagging roof" and "several of the roof rafters had collapsed and severed" but "the walls and roof . . . were standing at the time of inspection." *Mount Zion Baptist Church of Marietta*, 808 F. Supp. 2d at 1322 (internal quotation marks omitted); *see also Mulhern v. Philadelphia Indem. Ins. Co.*, 802 F. Supp. 2d 317, 323-24 (D. Mass. 2011) (declining to find additional coverage under an identical collapse provision where "the Building's roof split, leaving a gap of .75 inches" and "cracked open" in areas (internal quotation marks omitted)); *Rector St. Food Enters., Ltd*

_____

(Footnote continued.)

both motions. Therefore, Johnson Properties' "reply" brief is also its brief in response to Harleysville's motion for summary judgment, and new arguments based on Harleysville's moving papers are therefore appropriate. Consequently, the Court will consider Johnson Properties' ambiguity arguments raised in its responsive/reply brief.

*v. Fire & Cas. Ins. Co. of Conn.*, 827 N.Y.S.2d 18, 19 (N.Y. App. Div. 2006) (finding that a building that had large cracks in its façade and was sinking, out of plumb, and leaning was undisputedly standing and had therefore not "collapsed" for purpose of the policy's additional coverage provision).

Other courts, however, have determined that even collapse provisions that provide a definition of the term, such as the one in the Policy at issue here, are ambiguous. *See Kings Ridge Cmty. Ass'n, Inc. v. Sagamore Ins. Co.*, 98 So.3d 74, 79-80 (Fla. Dist. Ct. App. 2012) (concluding that an identical collapse provision was "susceptible to more than one reasonable interpretation, one providing coverage, and the other limiting coverage" where the flat roof of a clubhouse substantially depressed, and the drop ceiling and first eleven roof trusses deflected twelve inches); *see also Malbco Holdings, LLC v. AMCO Ins. Co.*, 629 F. Supp. 2d 1185, 1196 (D. Or. 2009). Courts finding the collapse provision at issue ambiguous, have reasoned that the four-part definition of collapse provided by the Policy is internally inconsistent. For example, in *Landmark Realty, Inc. v. Great American Insurance Co.*, Civ. No. 10-278, 2010 WL 5055805, at *1 (D. Md. Dec. 3, 2010), the court considered an identical collapse provision in the context of a building where part of the building's floor sunk nine inches due to decay rendering the building uninhabitable, but part of the building was unaffected. The *Landmark* court explained the ambiguity in the collapse provision:

> In sum, [the insured] relies on Subsection [(a)]'s definition of "collapse:" "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." This definition of collapse clearly applies here because there is no dispute that the collapse of the [floor in part of the

> building] resulted in the entire building being unusable for its intended
> purpose.  [The insurance company] relies on Subsections [(b) and (c)],
> which would exclude the damage to [the other part of the building] because
> that part did not fall down or cave in, even if it was in danger of doing so
> . . . and was still standing despite the unstable structural supports. . . .  The
> conflicting results produced by application of these collapse provisions
> creates an ambiguity which precludes the granting of summary judgment to
> either party.

*Id.* at *5 (footnote and internal citations omitted)[4]; *see also Scorpio*, 2012 WL 2020168
at *6 ("In this instance, part of a building, the roof, deflected approximately 6 inches
causing the building to be unsuitable for occupancy.  Thus, subsection (a) of the collapse
provision, arguably, affords coverage.  In addition, however, because the building was
still standing, subsections (b) or (d) may be read and understood to preclude coverage.").

The Court finds that the collapse provision in the Policy here is ambiguous.  The
circumstances of this case represent a prime example of the conflicting nature of the four
subsections defining collapse.   According to the city inspection and the reports of
Harleysville's and Johnson Properties' engineers, it is undisputed that the roof sagged
10.5 inches after the rain event.  It is also undisputed that roof joists were overloaded by
the pooling water and broke; causing part of the Building's ceiling to cave in.  Such
damage constitutes an "abrupt falling down or caving in of a building or any part of a
building."  The result of the sagging roof, broken joists, and hole in the ceiling was that at

---

[4] The *Landmark* court was admittedly facing a slightly different question than that
presented to the Court here.  In *Landmark* the insurance company was attempting to pay for only
part of the damage caused by the collapse, because part of the building remained standing.  2010
WL 5055805 at *3.  Therefore, the insurance company was not disputing that part of the building
had collapsed.  The court's reasoning remains applicable because the internal inconsistency in
the definition of collapse is just as relevant in a case such as this where Harleysville is relying on
the latter parts of the "collapse" definition to seemingly override the first part of the definition.

least one of the apartments in the Building could not "be occupied for its intended purpose" and was condemned by the City of Saint Paul.  Therefore, subdivision (a) of the definition of collapse in the Policy could be read as providing coverage.  *See Scorpio*, 2012 WL 2020168 at *6.  Harleysville also admitted that the broken roof joists and roof sag were caused by overloading due to the ponding water, indicating that the damage falls within the Policy's coverage for a collapse caused by "[w]eight of rain that collects on a roof."  However, the Building is still standing, and the roof is sagging, suggesting that no collapse occurred within the meaning of subdivision (d), which provides that "any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinking or expansion."

Because the damage caused to the Building can be read both as constituting and not constituting a collapse within the Policy, the Court finds the collapse provision ambiguous.[5]  Accordingly, the Court will construe this ambiguity in favor of Johnson

---

[5] The Eighth Circuit has noted that a district court need not "invariably construe" an ambiguous policy in favor of coverage, but instead may resort to extrinsic evidence to determine the reasonable expectations of the insured.  *See Minn. Sch. Bds. Ass'n Ins. Trust v. Emp'rs Ins. of Wausau*, 331 F.3d 579, 581-82 (8th Cir. 2003).  The Court does not interpret this case as requiring that ambiguous insurance policies always be submitted to a jury to determine the insured's reasonable expectations regarding coverage.  Instead, in order to avoid summary judgment, the insurance company must come forward with some extrinsic evidence demonstrating that a genuine issue of material fact remains regarding the reasonable expectations of the insured.  *See, e.g.*, *id.* (finding that the district court did not err in submitting the question of the insured's reasonable expectations to the jury where the record indicated that the policy had been unconditionally cancelled, and thus a fact question existed regarding whether it was reasonable to expect reinsurance coverage to have attached during the term of that policy); *Fenske v. Waseca Mut. Ins. Co.*, No. C9-93-2054, 1994 WL 149483, at *3-4 (Minn. Ct. App. Apr. 19, 1994) (remanding for consideration of the meaning of an ambiguous policy "[b]ecause

(Footnote continued on next page.)

Properties, and conclude that the collapse provision, when considered in isolation from the Water Endorsement, provides coverage for the collapse of part of the Building which was caused by the weight of rain that collected on the roof. *See Donarski v. Lardy*, 88 N.W.2d 7, 10-11 (Minn. 1958) ("[W]e . . . have a well-established rule in this state which is that the language of a policy, being that selected by the insurer and for its benefit, must be clear and unambiguous, and any reasonable doubt as to its meaning must be resolved in favor of the insured."); *see also Malbco Holdings,* 629 F. Supp. 2d at 1197 (finding an identical collapse provision to be ambiguous and resolving the ambiguity "against the insurer"); *Kings Ridge Cmty*, 98 So.3d at 79 (same).

### E.    Interaction Between Water Endorsement and Collapse Coverage

Having determined that, in isolation, the Water Endorsement could, and the collapse provision does, provide coverage for the damage at issue, the Court must consider how the two coverage provisions interact within the Policy.   Ultimately, the Court must determine whether, if coverage is possible under both provisions, Johnson Properties' coverage can be limited to $25,000 under the Water Endorsement.

_____

(Footnote continued.)

there are genuine issues of material fact regarding the circumstances under which the insurance contract was created, including the intent of the parties").  Here, Harleysville has identified no extrinsic evidence of any kind, nor has Harleysville argued at any point that Johnson Properties' interpretation of the Policy's collapse provision exceeds the reasonable expectations of an insured.  Accordingly, in the absence of any extrinsic evidence that could potentially create an issue of material fact regarding Johnson Properties' reasonable expectations, the Court will grant summary judgment in Johnson Properties' favor regarding coverage for collapse.

### 1.    The Anti-Concurrent Loss Provision

Harleysville argues that an anti-concurrent loss provision in the Policy precludes coverage under any other covered cause of loss if the Water Endorsement applies and $25,000 in damage has occurred.  Analysis of this contention requires several analytical steps.

First, the body of the Harleysville Policy (in the absence of the Water Endorsement) excludes "loss or damage caused directly or indirectly by . . . water that backs up or overflows from a sewer, drain or sump."  This exclusion contains the relevant language identified by Harleysville.  This lead up language states that the exclusion applies "regardless of any other cause or event that contributes concurrently or in any sequence to the loss."  This lead up language is known as an anti-concurrent causation clause or an anti-concurrent loss provision, and evidences the parties' intent to contract around the concurrent causation doctrine.  *See Friedberg v. Chubb & Son, Inc.*, 832 F. Supp. 2d 1049, 1057 (D. Minn. 2011), *aff'd*, 691 F.3d 948 (8th Cir. 2012); *see also TNT Speed & Sport Ctr., Inc. v. Am. States Ins. Co.*, 114 F.3d 731, 733 (8th Cir. 1997) (upholding a district court's conclusion that "parties may contract out of application of the efficient proximate cause doctrine").

To understand the import of the anti-concurrent loss provision, the Court begins by examining the concurrent causation doctrine that the anti-concurrent loss provision is intended to stymie.  Under the concurrent causation doctrine, where an excluded peril contributes to a loss, an insured may recover only if a covered peril is the efficient and proximate cause of the loss.  *Chubb & Son*, 691 F.3d at 952-53 (citing *Fawcett House,*

*Inc. v. Great Cent. Ins. Co.*, 159 N.W.2d 268 (Minn. 1968); *Anderson v. Conn. Fire Ins. Co.*, 43 N.W.2d 807 (Minn. 1950)).  Conversely, if an excluded peril is the efficient and proximate cause of the loss, then coverage is excluded.  *Id.* at 952; *see also Colella v. State Farm Fire & Cas. Co.*, 407 F. App'x 616, 622 (3d Cir. 2011) ("[W]hen there are two or more causes of loss, the policyholder's claim is covered as long as the immediate or proximate cause of loss is covered by the policy."  (alteration and internal quotation marks omitted)).  The efficient proximate cause of a loss is the fundamental cause, or the cause that set the chain of events into motion.  *See* Lee R. Russ & Thomas F. Segalla, 7 Couch on Insurance § 101:45 (3d ed. 2012).  Insurance companies use anti-concurrent causation clauses, like the one found in Harleysville's Policy, in order to exclude coverage when **any** portion of the loss was caused by an excluded event.  *See Leonard v. Nationwide Mut. Ins. Co.*, 499 F.3d 419, 425 (5th Cir. 2007) ("[T]his prefatory language denies coverage whenever an excluded peril and a covered peril combine to damage a dwelling or personal property.").  When an anti-concurrent loss provision is triggered, therefore, courts need not inquire into which of a covered or excluded loss was the proximate cause of the damage, but simply exclude coverage where any portion of the loss was caused or contributed to by an excluded loss.

With this background in mind, Harleysville appears to be arguing that the damage to the Building at issue here was caused, at least in part, by water backing up or overflowing from the roof drain.  Harleysville argues that such coverage is excluded under the Policy and is subject to an anti-concurrent causation clause.  If this clause is applied, Harleysville argues the exclusion for damage caused by water backing up or

overflowing from a drain would preclude any coverage caused by collapse, because an excluded cause (damage in excess of $25,000 caused by water backing up from a drain) contributed, at least partially, to the loss.

Although Harleysville's general argument regarding the functioning of an anti-concurrent causation clause is correct, the Court finds that the anti-concurrent causation clause in the Policy is not triggered by any of the coverages at issue in this case.  The anti-concurrent causation clause does not apply because coverage for damage resulting from a backed up water drain is **not** excluded under the Policy due to operation of the Water Endorsement.  The Water Endorsement modifies the Policy's coverage, and states that Harleysville "will pay for direct physical loss or damage to Covered Property . . . caused by or resulting from [w]ater or waterborne material which backs up through or overflows or is otherwise discharged from a sewer or drain."  The Water Endorsement specifically amends the Policy's exclusionary language regarding damage caused by water backing up or overflowing from a drain.  The Water Endorsement states that "[w]ith respect to the coverage provided under this Endorsement, the Water Exclusion in Section I – Property, is replaced by the following exclusion[.]"  The exclusion listed in the Water Endorsement does not contain the language "loss or damage caused directly or indirectly by . . . water that backs up or overflows from a sewer, drain or sump."  Therefore, pursuant to the Water Endorsement, damage caused by water that backs up from a drain is no longer part of the Policy's exclusion section.  Because water that backs up from a drain is no longer part of the Policy's exclusion section it is no longer subject to the anti-concurrent causation clause that prefaces the exclusion section.   For

Harleysville's argument to be persuasive, the exclusion for "loss or damage caused directly or indirectly by . . . water that backs up or overflows from a sewer, drain or sump" expressly removed by the Water Endorsement would somehow have to revert back into the Policy's exclusion section after $25,000 (the insurance limit of the Water Endorsement) of damage caused by water backing up or overflowing from a drain had occurred.  The language of the Water Endorsement does not support such a result. Instead the Water Endorsement affirmatively removes the exclusion for damage caused by water backing up or overflowing through a drain, and does not reinsert the exclusion into the Policy, even after the $25,000 cap on coverage has been reached.  Therefore, the Court concludes that the anti-concurrent causation clause does not apply to any potential coverage under either the Water Endorsement or the collapse provision.

### 2.      Simultaneous Coverage Under the Water Endorsement and Collapse Provision

Having determined that the anti-concurrent causation clause does not apply, the Court must next determine whether Johnson Properties can obtain coverage under both the Water Endorsement (with its $25,000 coverage limit) and the collapse provision.

When faced with multiple contributors to a single damage event, in the absence of an anti-concurrent loss provision, courts typically consider which contributor was the proximate cause of the damage.  *See, e.g.*, *Fawcett House, Inc.*, 159 N.W.2d at 270; *see also Wright v. Safeco Ins. Co. of Am.*, 109 P.3d 1, 6 (Wash. Ct. App. 2004) ("Under the efficient proximate cause rule, where a peril specifically insured against sets other causes in motion which, in an unbroken sequence and connection between the act and final loss,

produce the result for which recovery is sought, the insured peril is regarded as the proximate cause of the entire loss, even though other events within the chain of events are excluded from coverage." (internal quotations omitted)).   Courts undertake such an analysis, however, to distinguish between covered and excluded forces that have both contributed to a single loss.  *See Fawcett House, Inc.*, 159 N.W.2d at 270 ("[T]he loss here is covered because it was directly caused by a specifically covered risk, even though indirectly and incidentally enhanced by another peril expressly excluded from coverage.").   In other words, in applying an efficient proximate cause test, courts are attempting to parse out where to place the damage in the context of the policy – into an excluded or included coverage provision.

The question of causation presented by the present case is unusual, because it is typically irrelevant **which** of multiple covered events caused a loss, as, if coverage is found, the insurance company will pay the cost of the damage.  Here, the question is relevant because one of the causes of loss is subject to a $25,000 coverage limit.  The Court finds, however, that the efficient proximate cause inquiry undertaken by courts to distinguish between covered and excluded causes of loss is not the appropriate inquiry when presented with two covered causes of loss.  It would be nonsensical for a court to conclude that a loss was caused by both a covered and an excluded event because an insurance company cannot simultaneously provide and deny coverage. But there is nothing patently inconsistent in determining that a loss was caused by two separate kinds of covered events.  Instead, the Court concludes that the common definition of cause, as it

would be understood by a reasonable person in the position of the insured, should be applied to determine the scope of Johnson Properties' coverage.

The Policy states that Harleysville "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." This language is broad and indicates that Harleysville will be responsible for damages caused by or resulting from any covered cause of loss – even where two covered causes combined to cause the damage. Cause is defined as "something that occasions or effects a result" or "determines any motion or change or produces a phenomenon." *Webster's Third International Dictionary* 356 (2002); *see also The American Heritage Dictionary of the English Language* 295 (5th ed. 2011) (defining cause as "[t]he . . . event, or condition that is responsible for an action or result"). As explained above, it is undisputed that the weight of rain water pooling on the roof occasioned or effected a collapse of the roof, ceiling, and roof joists. Additionally, water backing up or overflowing through a drain was a condition that was also potentially responsible for some of the damage caused to the building. Because the damage to the Building was caused by or resulted from two covered events – the weight of rain water pooling on the roof as well as water backing up or overflowing from the roof drain – the plain language of the Policy dictates that Harleysville pay for the damage. The Court has found no legal principle or any portion of the Policy that would require or permit the Court to interpret the Policy as affording only the lowest possible amount of coverage where two covered causes contribute to a loss. Consequently, the Court will apply the plain language of the Policy which provides coverage for losses caused by water backing

up or overflowing through a drain (albeit limited to $25,000) and also provides full coverage for collapse caused by the weight of rain pooling on a roof.

Additionally, the Court finds that application of the common definition of cause in this circumstance is consistent with the Policy's designation of collapse coverage as "additional coverage." When considering additional insurance, like the collapse coverage at issue here, Courts have refused to apply either anti-concurrent causation provisions or efficient proximate cause analysis because "general exclusions listed in the Policy do not modify or qualify the additional collapse coverage." *State Auto. Mut. Ins. Co. v. R.H.L., Inc.*, No. 07-1197, 2010 WL 909073, at *12 (W.D. Tenn. Mar. 12, 2010); *see also Young Sook Pak v. Alea London Ltd.*, Civ. No. 1:08-CV-0824, 2009 WL 2366549, at *7 (M.D. Penn. July 30, 2009). In *R.H.L.* the court considered whether the insured could receive additional coverage for collapse, even though the court had already determined that a water exclusion precluded coverage under the policy for the damage and that the policy contained an anti-concurrent causation clause. 2010 WL 909073, at *11-12; *see also Koskovich v. Am. Family Mut. Ins. Co.*, No. A11-2206, 2012 WL 2369001, at *5 (Minn. Ct. App. June 25, 2012) (examining whether a policy provided additional coverage for collapse, even though the policy contained an anti-concurrent loss provision and the court had already concluded that the damage at issue was not covered by the policy pursuant to an exclusion for rot and mold). Because collapse coverage is additional insurance under the Policy, it is irrelevant to Johnson Properties' ability to obtain coverage under the collapse provision that the Water Endorsement may also provide coverage.

As a final matter, the Court notes that applying a common definition of the term cause avoids an interpretation of the Policy that would essentially render the additional coverage for collapse a nullity. *See Wyatt v. Wyatt*, 58 N.W.2d 873, 875 (Minn. 1953) (explaining that courts will not adopt a "construction of an insurance policy which entirely neutralizes one provision . . . if the contract is susceptible of another construction which gives effect to all its provisions and is consistent with the general intent").   If Harleysville is correct both that the Water Endorsement provides coverage for the damage at issue, and that by providing coverage the Water Endorsement prevents Johnson Properties from obtaining coverage for collapse caused by the weight of rain pooling on the roof, the collapse provision would be rendered meaningless.   Because gutters and roof drains are included in the backup or overflow provision in the Water Endorsement, it is difficult to imagine circumstances in which an insured's roof would collapse due to rain water collecting on the roof that would not also implicate water "overflowing" or "backing up" from a drain.   In instances of heavy rainfall, water would likely pool on the roof only if it is not draining properly.   Accordingly, adopting Harleysville's reading of the Policy would essentially always limit the insured to $25,000 of coverage under the Water Endorsement, instead of the full coverage for collapse due to the weight of rain pooling on a roof as described in the additional insurance section of the Policy.   Because adopting a definition of "cause" that limits Johnson Properties to recovering damages occasioned by only one covered event would have the effect of reading the collapse coverage out of the Policy, the Court declines to read "cause" within the Policy narrowly.

Therefore, the Court concludes that the Policy provides coverage for the damage to the Building pursuant to the collapse provision and potentially the Water Endorsement. Because Harleysville limited Johnson Properties' coverage to $25,000 under the Water Endorsement, the Court finds that no genuine issue of material fact remains regarding Harleysville's breach of the Policy by failing to reimburse Johnson Properties for damage to the Building caused by collapse. Accordingly, the Court will grant Johnson Properties' motion for summary judgment on its breach of contract claim, and deny Harleysville's motion.

## III.   WAIVER/ ESTOPPEL CLAIM

Harleysville also moves for summary judgment on Johnson Properties' hybrid waiver and estoppel claim.

### A.   Waiver

Johnson Properties' complaint alleges generally that Harleysville has waived its right to dispute coverage under the Policy by agreeing to provide coverage under the Water Endorsement. The Court finds that Harleysville unequivocally did not waive its right to dispute coverage.

"Waiver is the intentional relinquishment of a known right." *Frandsen v. Ford Motor Co.*, 801 N.W.2d 177, 182 (Minn. 2011). A valid waiver requires both "knowledge of the right" and "an intent to waive the right." *Id.* Furthermore "[w]aiver may be express or implied – knowledge may be actual or constructive and the intent to waive may be inferred from conduct." *Id.* (internal quotation marks omitted).

Here, Harleysville sent two letters regarding its coverage determination – one to Johnson Properties directly and one to counsel for Johnson Properties.   Several provisions of the letter are relevant to the issue of waiver.  First, Harleysville indicated in both letters that there was coverage under the Water Endorsement and no coverage under the collapse provision – the same arguments it advances in this litigation.   Therefore, Harleysville is not attempting to assert a position that it may have impliedly waived, instead its position on coverage has been identical throughout the course of the insurance dispute.   Johnson Properties has cited no authority, and the Court has found none, to support the proposition that payment under a certain provision of an insurance policy automatically waives an insurer's right to assert defenses to coverage under other provisions.

Second, Harleysville expressly indicated in the letters that its investigation was "subject to a complete reservation of rights," and that "[n]either Harleysville's investigation nor this letter or any other communication is a waiver of Harleysville's rights under the policy or the law whether or not mentioned in this letter."  Harleysville indicated that its investigation of the loss was ongoing and that the investigation "is being conducted subject to a complete reservation of rights.   Neither Harleysville's investigation nor this letter or any other communication is a waiver of Harleysville's rights under the policy or the law, whether or not mentioned in this letter.  Harleysville reserves all rights available to it."  Harleysville also stated that "its coverage position is based on the information available at this time.   Harleysville reserves the right to reconsider its coverage position upon receipt of additional information."  Therefore, it is

clear from the record that Harleysville did not waive its right to dispute Johnson Properties' coverage under the collapse provision. Therefore the Court will grant Harleysville's motion for summary judgment with respect to Johnson Properties' waiver claim.

### B.     Estoppel

Johnson Properties' waiver/estoppel claim also contains allegations that appear consistent with equitable estoppel. The Court finds that Johnson Properties has failed to demonstrate the existence of a material issue of fact with respect to the elements of equitable estoppel.

A party wishing to invoke equitable estoppel must prove several elements: (1) a representation or concealment of material facts; (2) the facts must be known by the party to be estopped at the time of the representation; (3) the truth of the facts must be unknown to the party claiming the benefit of estoppel at the time when the conduct was done; (4) the misrepresentation must have been made with the intention to induce reliance; (5) the party claiming the benefit of estoppel must have relied on the representations; and (6) the party claiming the benefit of estoppel must have relied on the misrepresentations to his detriment. *See Lunning v. Land O'Lakes*, 303 N.W.2d 452, 457 (Minn. 1980).

As an initial matter, Johnson Properties did not submit any argument in response to Harleysville's motion for summary judgment on the issue of estoppel, and therefore has likely waived the claim. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558

F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."); *Rodgers v. City of Des Moines*, 435 F.3d 904, 908 (8th Cir. 2006) ("Without some guidance, we will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments.").  Furthermore, the record does not support the application of equitable estoppel.   For example, Harleysville's letters regarding coverage contain no misrepresentations of the Policy's language.   Instead, Harleysville's letters are merely its own opinions regarding the applicability of the collapse coverage.  Johnson Properties also had access at all times to the true facts – i.e. the true language of the Policy.  Importantly, there is no evidence that Johnson Properties relied on Harleysville's coverage determination to its detriment. Indeed, Johnson Properties did not believe that Harleysville's coverage assessment was correct and almost immediately filed the instant lawsuit.  Therefore, the Court will grant Harleysville's motion for summary judgment as to Harleysville's estoppel claim.

## IV.    APPRAISAL

Johnson Properties also seeks a declaratory judgment, asking the Court to order an appraisal under the Policy.  Johnson Properties did not respond to Harleysville's motion for summary judgment on this claim, except to state "[t]o the extent there is a dispute over the valuation of covered damages subsequent to the ruling on these motions – appraisal maybe [sic] appropriate."  (Reply at 20, Feb. 14, 2013, Docket No. 34.)

A federal court "[i]n a case of actual controversy within its jurisdiction . . . may declare the rights and other legal relations of any interested party seeking such

- 37 -

declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

The phrase "case of actual controversy" imposes limitations on when a court may issue a

declaratory judgment similar to the rule that only "cases" and "controversies" are

justiciable under Article III of the Constitution.  *See Maytag Corp. v. Int'l Union, United*

*Auto., Aerospace & Agric. Implement Workers of Am.*, 687 F.3d 1076, 1081 (8th Cir.

2012).  In other words, the Court may only issue a declaratory judgment if there is "a

concrete dispute between parties having adverse legal interests."  *Id.*  "[T]he declaratory

judgment plaintiff must seek 'specific relief through a decree of a conclusive character, as

distinguished from an opinion advising what the law would be upon a hypothetical state

of facts.'"  *Id.* (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937)).

Further, while a declaratory judgment necessarily is allowed to issue before an injury has

occurred, "the plaintiff must face an injury that is 'certainly impending'" in order for a

claim to be ripe.  *Pub. Water Supply Dist. No. 8 of Clay Cnty., Mo. v. City of Kearney,*

*Mo.*, 401 F.3d 930, 932 (8th Cir. 2005) (quoting *Pennsylvania v. West Virginia*, 262 U.S.

553, 593 (1923)).

The Policy clearly lays out a procedure for obtaining an appraisal if the parties

disagree about the amount of loss.  There is no evidence in the record that the parties

disagree about the amount of appraisal.  Pursuant to the Policy, either Harleysville or

Johnson Properties can request an appraisal by submitting a written demand.  There is no

evidence that Johnson Properties has attempted to obtain an appraisal under the Policy, or

that any attempt has been or would be unsuccessful.  Therefore, Johnson Properties has

failed to present a controversy that is ripe for adjudication.  Furthermore, there is no

indication that it is "certainly impending" that Harleysville would reject Johnson Properties' demand for an appraisal.   Therefore, the Court will grant Harleysville's motion for summary judgment with respect to Johnson Properties' appraisal claim.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Plaintiff's Motion for Partial Summary Judgment [Docket No. 16] is **GRANTED**.

2.     Defendant's Motion for Summary Judgment [Docket No. 28] is **GRANTED in part** and **DENIED in part** as follows:

   a.     Defendant's Motion is **DENIED** as to Plaintiff's breach of contract claim (Count I).

   b.     Defendant's Motion is **GRANTED** as to Plaintiff's waiver/estoppel claim (Count II) and declaratory judgment claim (Count III).   These claims are **DISMISSED with prejudice**.

3.     Within twenty-one (21) days of the entry of this Order, Plaintiff shall meet and confer with Defendant to ascertain whether any disputes exist regarding damages.   In the event the parties are able to agree on the amount of damages sustained by the Building, the parties shall submit a stipulation to the Court regarding such damages.

4.      If the parties are unable to agree on the amount of damages, within twenty-eight (28) days of the entry of this Order, Plaintiff shall submit to the Court, and serve upon Defendant: (a) a letter brief not to exceed 3,000 words regarding its damages calculation; and (b) documentation supporting its damages request.

5.      Within seven (7) days after service of Plaintiff's letter brief, Defendant may submit to the Court, and serve upon Plaintiff: (a) a letter brief not to exceed 3,000 words raising any objections it may have to Plaintiff's damages calculation; (b) a request for a hearing, status conference, or trial regarding the issue of damages, if necessary; and (c) documentation supporting its objections and request.

DATED:  September 30, 2013                         s/ John R. Tunheim
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                        United States District Judge